_____

Nos. 95-2539MN, 95-2655MN, 95-2656MN, 95-2657MN,
      95-2658MN, 95-2659MN, 96-1316MN
_____


```
    _____          *
                            *
    No. 95-2539MN           *
    _____          *
                            *
United States of America,   *
                            *
          Appellee,         *
                            *
     v.                     *
                            *
                            *
Calvin Lucien Delpit, also  *
known as Monster,           *
                            *
                            *
          Appellant.        *    On Appeal from the United
                            *    States District Court
                            *    for the District of
    _____          *    Minnesota.
                            *
    No. 95-2655MN           *
    _____          *
                            *
United States of America,   *
                            *
          Appellee,         *
                            *
     v.                     *
                            *
                            *
Dennell Malone,             *
                            *
          Appellant.        *
                            *
                            *
```

_____

No. 95-2656MN
_____

United States of America,

      Appellee,

    v.

Jermaine Dana Saunders,

      Appellant.

 

_____

No. 95-2657MN
_____

United States of America,

      Appellee,

    v.

Zackarrie Emil Prado,

      Appellant.

 

_____

No. 95-2658MN
_____

United States of America,

      Appellee,

    v.

Lavern Thomas,

      Appellant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

```
                                              *
                                              *
        No. 95-2659MN                         *
    _____                          *
                                              *
United States of America,                     *
                                              *
            Appellee,                         *
                                              *
        v.                                    *
                                              *
                                              *
Jai Anthony Jones,                            *
                                              *
            Appellant.                        *
                                              *
                                              *
                                              *
    _____                          *
                                              *
        No. 96-1316MN                         *
    _____                          *
                                              *
United States of America,                     *
                                              *
            Appellee,                         *
                                              *
        v.                                    *
                                              *
                                              *
Chanise Janelle Lynn,                         *
                                              *
            Appellant.                        *
```

_____

Submitted:  May 15, 1996

Filed:  August 28, 1996

_____

Before RICHARD S. ARNOLD, Chief Judge, MAGILL, Circuit Judge, and VAN
    SICKLE,* District Judge.

_____

---

*The Hon. Bruce M. Van Sickle, United States District Judge
for the District of North Dakota, sitting by designation.

-3-

RICHARD S. ARNOLD, Chief Judge.

A jury convicted the seven defendants of various crimes, including interstate murder-for-hire, 18 U.S.C. § 1958(a), arising out of a Twin Cities-based drug conspiracy and gang rivalry. They received prison sentences ranging from 97 months to life. The defendants challenge their trial, convictions, and sentences. We reject most of these challenges. We agree, however, with Chanise Lynn and Zackarrie Prado that their interstate murder-for-hire convictions must be reversed. They may well have taken part in a murder plot, but the government did not prove they violated federal law. Finally, we remand Saunders's case for resentencing because the murder-for-hire plot of which he was a leader or organizer did not involve five or more "participants." U.S.S.G. § 3B1.1(a).

I.

The jury found that the defendants all participated in the drug-dealing and strong-arm tactics of a Twin Cities gang called the Shotgun Crips. Dennell Malone and Jermaine Saunders were the ringleaders of the operation. They imported cocaine from California, for re-sale in Minnesota, through their source, Kenneth Washington (who apparently remains a fugitive). The operation included couriers who smuggled procaine (a cutting agent used to make crack) from California to Minnesota; underlings who helped convert cocaine powder into crack; and middle-men who bought crack from the operation and sold it to others. And in August 1994, the operation employed the services of Calvin "Monster" Delpit, a Los Angeles-based hitman, to intimidate a rival gang and competitor in the Twin Cities drug market.

We describe the evidence against the individual defendants in more detail below. For now, we will simply summarize the case against the Malone/Saunders operation. The case grew out of an investigation into the Los Angeles Shotgun Crips' Minnesota

outreach efforts.  Beginning in May 1994, government agents began wiretapping telephones used by Larry Thomas, and they intercepted coded conversations about drug-dealing.  These conversations led the agents to one of Thomas's customers, Tim Nelson, who agreed to cooperate with the investigation.

Thomas's drug source, the wiretaps revealed, was the Malone/Saunders operation, and Thomas owed the operation a large sum of money.  On June 7, the police observed as Thomas passed a paper bag to Malone and Saunders during a pre-arranged money drop.  That night, Malone and Saunders told Thomas he hadn't paid all the money he owed.  Malone also tried to sell Thomas a cellular phone, which, he suggested, would help them avoid wiretaps.  Thomas continued to negotiate with Washington and Malone to purchase more drugs, but because Thomas was so far behind in his payments, they cut him off.  Thomas continued his relation with the operation, though, until mid-July, when he caught on that they were being investigated.

Malone and Saunders, however, did <u>not</u> quit their drug-dealing activities.  That same June, Malone was using three juveniles, including his younger brothers, to sell drugs for him.[1]  And in August, the government intercepted phone calls between Saunders and Washington concerning a 15.6 kilogram cocaine shipment that had been intercepted in Utah.  The calls revealed how Malone had set up the shipment and recruited the failed courier.  The calls also suggested that at least one other significant drug shipment <u>had</u> made it through to Minnesota.

That same August, the government learned that Malone and Saunders had hired Calvin Delpit, an L.A. hitman, to come to Minnesota and kill members -- no one in particular, apparently --

---

[1]All three young men pleaded guilty to drug-related offenses. See <u>United States v. D.A.M.</u>, 69 F.3d 542 (8th Cir. 1995).

-5-

of the Shotgun Crips' rival gang, the Vice Lords.  On August 26, Saunders suggested that a local maternity ward would be a good place to catch one prospective victim (a new father) unaware.  Malone and Saunders then arranged for guns and a driver for Delpit so he could "put some work on somebody."  Chanise Lynn drove Delpit around that night, and the next, but they couldn't find anyone to kill.  Delpit called Saunders to tell him that he and Lynn had found some potential victims, but the victims had seen him creeping up to do the hit and had escaped.  Saunders urged Delpit to keep trying, and agreed to send a partial payment of $1,500 to Delpit's wife in California.  Saunders then outlined a new plan:  Delpit would follow a lead car which would flash its brake lights to indicate vulnerable Vice Lords nearby.  The police overheard Saunders's plan and responded with round-the-clock surveillance on Delpit.

The next day, August 28, Prado called Saunders to complain that he'd seen Vice Lords driving by his mother's house.  Saunders told Prado he'd better kill the Vice Lords before they got him first.  Prado suggested they could ambush the Vice Lords that afternoon at a concert in downtown Minneapolis, and Saunders put Prado in touch with Delpit.  A little later, Prado picked up Delpit, and then Malone.  The group then split up into two cars, with Prado and Malone in the lead and Delpit following by himself.  The police, concerned that the drive-by plan was about to go off, stopped the cars.  Delpit tried to escape.  He pulled his gun, pointed it at an officer, then threw the gun away, and ran off.  He was captured, and his gun was recovered.  A second gun was found in his car.  Malone and Prado were released because they were unarmed.  Later, the police overheard phone conversations confirming that Prado, Malone, and Delpit had been planning to do a drive-by shooting when they were apprehended.

Meanwhile, the operation's drug activities continued.  A few days later, Saunders sent Chanise Lynn to California to pick up

some procaine.  Saunders asked Jai Jones, who was in Los Angeles, to help Lynn get the procaine, and to accompany her back to Minnesota.  Jones and Lynn arrived back in Minnesota with two black bags.  Prado met them at the airport, dropped Lynn off at her house, and then he and Jones delivered the procaine to Malone and Saunders.  While the police were getting a warrant to search the house where Malone and Saunders had divided up the procaine and were getting ready to "cook" the crack, people started leaving the house.  The police stopped Jones and Prado, and found seven pounds of procaine in their car.  Malone and another left next, and the police found seven more pounds of procaine, a scale, a clone cellular phone, and almost $5,000 in cash in the car.  Finally, Saunders and two others left.  The police tried to stop them and, during a high-speed chase, Saunders threw two guns and a backpack out of the car.  The police eventually caught the car, arrested Saunders, and found the guns (both loaded).  They also found three more pounds of procaine and a scale in the car.  The next day, someone turned the backpack over to the police.  It contained another clone cellular phone, 1.5 kilograms of powder cocaine, wrapped in a special fashion, just like the cocaine shipment that had been intercepted in Utah.

The government brought a fifteen-count indictment against the defendants.  All but Delpit were included in Count 7, which alleged a conspiracy to distribute crack cocaine.  21 U.S.C. § 846.  Delpit, Malone, Saunders, Lynn, and Prado were charged with interstate travel with the intent to commit murder-for-hire, 18 U.S.C. § 1958(a), and conspiracy to violate § 1958(a).  The rest of the counts charged different defendants with various drugs-, fraud-, and weapons-related crimes.[2]  All the

_____

[2]Malone, Saunders, and Delpit were charged in Count 3 with use of firearms in connection with a crime of violence, 18 U.S.C. § 924(c)(1); Delpit was charged in Count 4 with being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1); Saunders was charged in Count 5 with possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), in Count 6 with use of firearms in connection with drug trafficking, 18 U.S.C. § 924(c)(1), and in Count 15 with obtaining cellular telephone services by fraud, 18 U.S.C. § 1029(a)(1); Malone was charged in Counts 9 and 8 with aiding and abetting possession with intent to distribute and distribution of cocaine base, 21 U.S.C. §§ 841(a)(1), in Count 10 with using minors in drug trafficking, 21 U.S.C. § 861(a)(1), and

-7-

appellants but Prado

---

in Count 13 with obtaining cellular telephone services by fraud, 18 U.S.C. § 1029(a)(1); Lynn was charged in Count 11 with possession with intent to distribute cocaine base, 21 U.S.C. § 841(a)(1); Malone, Saunders, Lynn, and Thomas were charged in Count 12 with conspiracy to engage in drug trafficking, 21 U.S.C. § 846.

were convicted on all counts against them; the jury acquitted Prado on the drug-conspiracy charge (Count 7).  Malone and Saunders received life sentences; Delpit, 19 years; Thomas, 15 years and three months; Jones, nine years and four months; Lynn, nine years; and Prado, eight years and one month.

## II.

This is a complicated case.  Many of the defendants' claims overlap with others'; some arguments are raised by only one or a few.  We think this opinion will be easier to follow if organized by shared claims and arguments instead of by the individual defendants bringing them.

### A.  Severance

Six of the seven defendants -- all but Delpit -- insist that the District Court should not have joined their cases with the others' and should have granted their motions to sever.  The District Court found that because "the conspiracies alleged are interconnected and encompass each of the individual substantive counts, joinder of the defendants and counts is proper."[3]  We will reverse the District Court's denial of the severance motions only

---

[3]Order (Dec. 30, 1994), adopted by Memorandum and Order (Jan. 18, 1995).

if it abused its discretion, resulting in definite prejudice. United States v. Darden, 70 F.3d 1507, 1526 (8th Cir. 1995), cert. denied, 116 S. Ct. 1449 (1996). In this case, the Court did not abuse its discretion, nor have the defendants identified specific prejudice.

Under Fed. R. Crim. P. 8(a), offenses may be joined if they are of the same or similar character, or are based on the same act or transaction, or on different acts or transactions which are part of a "common scheme or plan." Defendants may be joined if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting [the] offense . . .." Fed. R. Crim. P. 8(b). See Darden, 70 F.3d at 1526-27 (joined defendants and counts were factually interrelated). Importantly, not every defendant joined must have participated in every offense charged. United States v. Jones, 880 F.2d 55, 62-63 (8th Cir. 1989).

We agree with the District Court that joinder was proper in this case. All the defendants but Delpit were charged with the same, underlying drug conspiracy (Count 7), and the government alleged that Malone and Saunders hired Delpit to do a contract killing to increase their operation's prestige and profits. It doesn't matter that Larry Thomas and Jai Jones had nothing to do with the murder-for-hire plot, or that Delpit was not indicted for the drug conspiracy. As the District Court observed, when violence is part of the conspiracy's modus operandi, "charges stemming from that violence are properly joined with the conspiracy charges, even if not all members of the conspiracy participated in the violence."[4]

Even when Rule 8(a) permits joinder, a trial court may order separate trials on different counts, or sever certain defendants'

_____

[4]Memorandum and Order, at p. 4 (Jan. 18, 1995).

-10-

cases from others', to protect defendants' fair-trial rights.  Fed. R. Crim. P. 14; <u>Darden</u>, 70 F.3d at 1527.  We read Rules 8 and 14 in favor of joinder.   <u>Id.</u> at 1528 ("[A] joint trial `gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'"); <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993) (joint trials "avoid[] the scandal and inequity of inconsistent verdicts").  The presumption against severing properly joined cases is strong.  It is not enough that a defendant thinks his chances for acquittal would be better in a separate trial, <u>Zafiro</u>, 506 U.S. at 540.  See <u>Hollins v. Dept. of Corrections</u>, 969 F.2d 606, 608 (8th Cir. 1992) (noting "heavy burden").

Saunders complains because Delpit told the jury that he was a drug dealer -- not a killer -- and that he came to the Twin Cities to broker drug deals.  True, Delpit's defense did not put Saunders and the others in the best light.  But co-defendants are often hostile to one another, and one will try frequently to "point the finger," to shift the blame, or to save himself at the expense of the other.  "Antagonistic" defenses require severance only when "`there is a danger that the jury will unjustifiably infer that <u>this conflict alone demonstrates that both are guilty.</u>'"  <u>United States v. De Luna</u>, 763 F.2d 897, 921 (8th Cir.) (citation omitted) (emphasis added), <u>cert. denied</u>, 474 U.S. 980 (1985); see also <u>Zafiro</u>, 506 U.S. at 538-41; <u>Darden</u>, 70 F.3d at 1526.  That danger was not present in this case.

The self-described "minor players" -- Thomas, Prado, Jones, and Lynn -- argue that they were prejudiced by the extra courtroom security, the gang affiliations and disruptive courtroom behavior of some defendants, the spillover taint of the murder-for-hire charges and the evidence relating to those charges, and by publicity and paranoia about "black gang-crime" in the Twin Cities.  We reject all these claims.  Severance is not required merely because evidence which is admissible only against some defendants

may be damaging to others, <u>United States v. Blum</u>, 65 F.3d 1436, 1444 (8th Cir. 1995), <u>cert.</u> <u>denied</u>, 116 S. Ct. 824 (1996); or because co-defendants engage in disrespectful behavior in court, <u>cf.</u> <u>United States v. Garrett</u>, 961 F.2d 743, 745-46 (8th Cir. 1992) (odd and disruptive behavior of co-defendant's counsel was not so prejudicial as to require severance); or because the joint trial requires enhanced courtroom security. See <u>Blum</u>, 65 F.3d at 1444. Nor is it enough for a defendant to claim, as Larry Thomas does here, that he needed a separate trial to call a co-defendant as a witness. He must show (and he has not) that it is likely his co-defendant actually would have testified and that this testimony would have been exculpatory. <u>United States v. Anthony</u>, 565 F.2d 533, 538 (8th Cir. 1977), <u>cert. denied</u>, 434 U.S. 1079 (1978).

The Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions like those given by the District Court in this case. See <u>Zafiro</u>, 506 U.S. at 540-41. The District Court repeatedly instructed the jury -- using an instruction drafted by the defense -- that the murder-for-hire evidence was admissible only against the defendants charged with interstate murder-for-hire. The jury acquitted Prado and one other defendant on the drug-conspiracy charge, which shows they were able to separate out the drug-related evidence from the murder-related evidence. See <u>United States v. Jackson</u>, 64 F.3d 1213, 1217 (8th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 966 (1996). The evidence simply does not support Thomas's charge that the jury saw and judged the defendants as a "nine-headed monster."

A defendant must show actual prejudice before we will reverse a denial of a motion for severance. None of the defendants has made such a showing, and the District Court did not abuse its discretion. We think the Court did a good job managing this very difficult case. In re-affirming the law's preference for joint trials, we do not endorse guilt by association. Instead, we

presume, as we must, that juries can and do follow instructions conscientiously, evaluate evidence carefully, and judge defendants individually.

    B.   Sergeant Murphy's Interpretation of the Coded Conversations

     The government's investigation and prosecution depended heavily on wiretapped telephone conversations; about 100 of these conversations were introduced at trial.  These conversations were tricky for at least three reasons.  First, many of the speakers used slang, or street jargon (e.g., "straps" for "guns" and "mix" for "procaine").  Second, many of the conversations were in code (e.g., "let's go play ball" for "let's do a cocaine deal").  Third, the speakers often stuck the syllable "iz" in the middle of words, resulting in a kind of "pig latin" (e.g., "kiz-ar" means "car," and "shiz-ootin" means "shooting").

     Sergeant James Murphy prepared transcripts of the wiretap evidence with translations of the "pig latin" words in brackets and, at trial, he identified most of the taped conversations.  He also gave the jury his opinion about the meaning of certain code words and slang terms.  Lynn, Delpit, Jones, and Saunders argue that Sergeant Murphy's testimony went beyond interpretation to speculative, prejudicial, testimony.  As Jones puts it, Sergeant Murphy's explanations and translations were only his opinions that the defendants were guilty.  The defendants also insist that Sergeant Murphy's testimony was unnecessary, because the jury could easily have interpreted the tapes on its own, and they contend that the District Court committed reversible error by allowing the testimony.  We disagree.

     Saunders cites the following exchange as an example of Sergeant Murphy's allegedly over-creative interpretation:

    [Thomas's Voice]:       "You at least have a shade over some

motherf*****, man!"

Sergeant Murphy interpreted this statement:

> I don't believe he liked . . . having to meet out
> in the open like that.

Delpit provides another example:

> [Saunders's Voice]    The ni**** got my, um, I can't really even
> like let ah, him handle his business cuz I
> can't get to no straps.  He got like two of my
> straps.  You know what I'm saying?

Sergeant Murphy, when asked what this meant, said:

> Dennell Malone has two of Jermaine Saunders' guns.
> He can't let Monster go out and take care of the
> business that he was up there for[,] to shoot some
> Vice Lords.

A third example:  Saunders said, on tape, "He was fittin to liz-iz-iz-ay some down."  Sergeant Murphy testified that to "lay some down" meant to kill someone.  And when asked whom Saunders was talking about, Sergeant Murphy said, "The Vice Lords."

It is well established that experts may help the jury with the meaning of jargon and codewords.  See, e.g., United States v. Lowe, 9 F.3d 43, 47 (8th Cir. 1993), cert. denied, 510 U.S. 1181 (1994).  There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis.  See United States v. Scavo, 593 F.2d 837, 844 (8th Cir. 1979) (gambling conversations which were "virtually incomprehensible to the layman, are fraught with meaning to a person familiar with gambling enterprises").  We have no doubt that Sergeant Murphy is an "expert" or that he was able to assist the District Court and

-14-

explain the defendants' slang to the jury. The argument that Murphy was unqualified because he lacks degrees or advanced training in the field is silly. Sergeant Murphy has learned drug dealers' jargon through nearly 30 years of on-the-job experience, the best education there is for this type of thing. See United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) ("[H]ard-core drug trafficking scarcely lends itself to ivied halls. In a rough-and-ready field such as this, experience is likely the best teacher.") And, after reviewing many of the wiretapped conversations, we cannot agree with the defendants that the tapes were so clear that Sergeant Murphy's testimony was unnecessary.[5]

That said, we agree that Sergeant Murphy appears on occasion to have gone beyond merely translating straightforward terms. But even if the Sergeant's testimony did, at times, "go [ ] beyond the plain meaning of the recorded conversation[s]," we must still decide whether there is a "significant possibility" that this testimony had a "substantial impact on the jury." United States v. Sanchez-Sotelo, 8 F.3d 202, 210-211 (5th Cir. 1993) (agent's testimony went beyond the plain meaning of the recorded conversation, but jury could have inferred the defendant's guilt from other evidence), cert. denied, 114 S. Ct. 1410 (1994). We are sure it did not. Sergeant Murphy's occasional elaborations referred to or were supported by other evidence. For example, when Sergeant Murphy testified that "Monster" was in town to "shoot some Vice Lords," this testimony was based on other recorded conversations, also in evidence, about Delpit's having been recruited to kill Vice Lords. See United States v. Fregoso, 60 F.3d 1314, 1328 (8th Cir. 1995) (defendant failed to prove prejudice because expert's testimony about drug smuggling was

---

[5]It appears the defendants don't really believe this either. Prado's brief notes that Sergeant Murphy had to interpret "Saundersease," a "combination of hybrid pig latin and street slang which is difficult to understand until one is accustomed to it." Jones concedes as much in his brief as well.

similar in kind to other evidence).

The District Court instructed the jury that it was not bound by the opinion of any expert. See United States v. Daniels, 723 F.2d 31, 33 (8th Cir. 1983) (any possibility of undue prejudice from expert's interpretation of gambling jargon was removed by trial court's careful instructions) (citing Scavo, 593 F.2d at 844). In fact, Delpit brought in an expert of his own to dispute some of Sergeant Murphy's interpretations. We are confident that Sergeant Murphy's occasionally expansive translations -- which were, again, grounded in other evidence -- did not have a "substantial impact" on the jury. See Sanchez-Sotelo, supra; United States v. Carrazana, 921 F.2d 1557, 1568 (11th Cir.) (any error in expert's interpretation of defendants' slang was harmless), cert. denied, 502 U.S. 865 (1991); cf. United States v. Dicker, 853 F.2d 1103, 1110-11 (3d Cir. 1988) (where recorded conversations were perfectly clear, and expert's testimony repeatedly supplemented the conversations, testimony was prejudicial and required a new trial).

## C.   Other Evidence Issues

Several defendants raise other evidence-related claims. We will not overturn a trial court's decision concerning the admissibility of evidence absent abuse of discretion. See, e.g., United States v. Roulette, 75 F.3d 418, 423 (8th Cir. 1996).

### 1.   Delpit's Prior Felony Convictions

Calvin Delpit was charged, in Count 4 of the indictment, with being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). The prior felonies alleged were credit-card fraud and rape. Delpit offered to stipulate to the existence and number of prior felonies, but the government declined. Delpit therefore decided to plead guilty to the felon-in-possession count. He now claims "[h]e had

-16-

no other choice" and argues that the District Court abused its discretion by not ordering the government to stipulate to his prior offenses or granting his motions to sever or to strike.

As Delpit candidly admits, "the government is not bound by . . . an offer to stipulate and . . . it is not error to allow the government to introduce more than one conviction in a case where only a single conviction is necessary . . .." United States v. Garner, 32 F.3d 1305, 1311 (8th Cir. 1994), cert. denied, 115 S. Ct. 1366 (1995). He argues, though, that the Court did not adequately consider the danger his prior rape conviction posed to his chances for an impartial verdict on the murder-for-hire charges. In Delpit's view, the Court "forced" Delpit to choose between an unfair trial on all the charges against him and giving up his jury-trial right on the felon-in-possession count.

Delpit decided it was in his best interest to plead guilty instead of going to trial. No doubt, this was a difficult decision, but it was no different from the hard choices made by thousands of defendants every day. Perhaps, in an extraordinary case, a trial court's allowing the government to refuse to stipulate to a prior conviction would create such clear and compelling prejudice as to be an abuse of discretion, see United States v. Bruton, 647 F.2d 818, 825 (8th Cir.) ("[A] case might be imagined where proof of a plurality of convictions would be prejudicial . . .."), cert. denied, 454 U.S. 868 (1981); Romano v. Oklahoma, 114 S. Ct. 2004, 2013 (1994) (O'Connor, J., concurring) ("It may well have been better practice for the State to agree to accept petitioner's stipulation offer . . .."), but this is not such a case.[6]

_____

[6]Delpit's reliance on United States v. Poore, 594 F.2d 39 (4th Cir. 1979), is misplaced. In Poore, the government accepted the defendant's stipulation. Id. at 40-41. The court held that, because the government accepted the stipulation, the district court erred by not redacting references to the stipulated offense from the indictment. Poore has nothing to do with whether the government must accept a defendant's offer to stipulate. See Poore, 594 F.2d at 41 (noting that government "is not required to accept defendant's proffered general stipulation of conviction of felony . . . in lieu of offering proof thereon") (citing United States v. Smith, 520 F.2d 544, 548 (8th Cir. 1975), cert. denied,

-17-

## 2.   Delpit's Nickname

Delpit's unfortunate nickname is "Monster."  Before trial, he moved to strike this nickname from the indictment.  The District Court denied this motion, correctly noting that "the use of this name is necessary to fully identify . . . Delpit."  Delpit now claims he was denied a fair trial because the government's "continued and repeated reference to his nickname was tantamount to testimony about his character . . .."  We disagree.  In some cases, the use of a defendant's irrelevant nickname to suggest his bad character or unsavory proclivities may be prejudicial, see, e.g., United States v. Williams, 739 F.2d 297, 299-300 (7th Cir. 1984), but this is not such a case.  There was no way for the jury to avoid hearing Delpit's nickname, because he was referred to in the wiretaps almost exclusively as "Monster."

## 3.   Mention of Murdered Police Officers

In one taped phone call, Saunders and Malone discussed how Malone, Delpit, and Prado were stopped by the police on their way to do a drive-by shooting.  Malone complained that the officers who stopped them had their badge numbers covered with black tape.  He said the tape was on the badges because of the "two clowns" (police officers) who "got smoked over on the other side of town."  Malone also said the officers had harassed him, and that he was going to tell his lawyer that the officers had hidden their badge numbers.  When this tape was played at trial, Sergeant Murphy explained that the officers had small black ribbons on their badges honoring two officers who had been killed recently in the line of duty. Prado

---

429 U.S. 925 (1976)).

-18-

and Jones now argue that the District Court abused its discretion by allowing Sergeant Murphy to explain the ribbons. They claim that the mention of the two dead police officers was far more prejudicial than probative. Jones says that he was particularly prejudiced because he had nothing to do with the murder-for-hire plot. We disagree. Even if the reference to the murdered officers as "clowns" could have reflected badly on Malone and Saunders, we believe this isolated incident did not prejudice Prado or Jones.

### 4. Co-conspirators' Statements

Dennell Malone states that the District Court abused its discretion in admitting statements by his co-conspirators. This claim is poorly developed; it appears Malone is simply restating his argument that his trial should have been severed from his co-defendants'. He suggests that "because there were multiple conspiracies" (which, he argues, should have been tried separately) "the trial court should have been more scrupulous in determining the admissibility of what would otherwise be hearsay and give meaningful cautionary instructions." We do not know which statements Malone is objecting to; he identifies none. We can only note, once again, that, as Malone admits, the District Court was careful to instruct the jury that certain evidence was admissible only on the murder-for-hire counts, or against the murder-for-hire defendants, and not on the drug counts.

### 5. Guns Evidence

Jai Jones contends he was denied a fair trial because the District Court admitted various guns into evidence, guns which had nothing to do with the case against him. True, guns _were_ admitted into evidence which had nothing to do with Jones, but the government never argued otherwise. And just because the guns were not relevant to the charges against Jones does not mean they were not admissible against his co-defendants. It is a simple fact of

joint trials that some evidence is relevant to and admissible against only some defendants. The proper response is to instruct the jury, as the District Court did in this case, that the evidence -- here, the guns -- is admissible against some defendants but not others. In any event, Jones has not proved, or even alleged with specificity, any prejudice, so there was no abuse of discretion.

### D. Use of Transcript in Jury Deliberations

Jermaine Saunders argues that the District Court abused its discretion by allowing the jury to use transcripts of the wiretapped conversations during trial and deliberations. First, Saunders complains that the government did not give the defendants enough time to evaluate the transcripts to insure their accuracy. Next, he says that the transcripts were not "objectively verifiable" translations of the recordings; instead, they included the government's "prefabricated subjective interpretations of conversations that were recorded in English." Saunders also insists that there was no need for the transcripts, because the tapes themselves were clear and audible, and the speakers were identified in Sergeant Murphy's testimony. See United States v. McMillan, 508 F.2d 101, 105 (8th Cir. 1974) ("[T]he need for . . . transcripts is generally caused by two circumstances: inaudibility of portions of the tape . . . or the need to identify the speakers."), cert. denied, 421 U.S. 916 (1975). In Saunders's view, the transcripts distorted, and distracted the jury's attention from the real evidence -- the tapes themselves.

It is well settled that the jury may use transcripts of wiretapped conversations during trial and deliberations. See United States v. Byrne, 83 F.3d 984, 990 (8th Cir. 1996); United States v. Riascos, 944 F.2d 442, 443-44 (8th Cir. 1991); McMillan, supra. Saunders has not identified any particular inaccuracies in the transcripts. It was not "inaccurate" for the government to include, in brackets, translations of the "pig latinisms" on the

tape (*i.e.*, to take out the "iz" syllable, when appropriate). We also note that the defense lawyers prepared transcripts of their own, which were also given to the jury. For all we know, the jury never even looked at the government's transcripts, only at the defendants'. Most importantly, the District Court instructed the jury, diligently and repeatedly, as it was required to do, that the tapes themselves, not the transcripts, were evidence. See United States v. Foster, 815 F.2d 1200, 1203 (8th Cir. 1987). We assume the jury did as it was told.

E.  Jury Instructions

Chanise Lynn and Dennell Malone object to the District Court's reasonable-doubt instruction, and Jai Jones and Malone contend that the District Court should have given a multiple-conspiracy instruction. We reject both these claims.

1.  Reasonable-Doubt Instruction

The District Court instructed the jury as follows:

> Reasonable doubt is a doubt based on reason and common sense and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act.
>
> Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

Lynn and Malone object to the "mere possibility of innocence" language. Lynn argues that the reasonable-doubt instruction "misdefined the government's burden" by suggesting a "more likely than not," or "clear and convincing," rather than a "beyond a

-21-

reasonable doubt," standard of proof.  Malone raises similar objections.

The "beyond a reasonable doubt" standard is a bedrock due-process requirement, but, like most constitutional standards, it does not come in a ready-made package.  See Victor v. Nebraska, 114 S.Ct. 1239, 1243 (1994) ("[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.")  We have repeatedly rejected challenges to the "mere possibility of doubt" language used in this case.  See United States v. Simms, 18 F.3d 588, 593 (8th Cir. 1994); United States v. Mabry, 3 F.3d 244, 249 (8th Cir. 1993), cert. denied, 114 S. Ct. 1403 (1994); see also Victor, 114 S. Ct. at 1248-49 (rejecting challenge to "not a mere possible doubt" language).  The instruction used in this case strikes us as a helpful and accurate way of communicating the correct standard of proof to the jurors.  After all, it is possible to have doubts that are not reasonable.

2.    Multiple-Conspiracy Instruction

Jones and Malone insist that there were three drug conspiracies involved in this case, and that the District Court erred in refusing to give a multiple-conspiracy instruction.  There may have been common actors, he argues, but there were several separate criminal agreements.  Malone urges a similar argument.  A trial court should give a multiple-conspiracy instruction when, and only when, the evidence supports it.  United States v. Jackson, 67 F.3d 1359, 1367 (8th Cir. 1995), cert. denied, 116 S. Ct. 1684 (1996).

The Malone/Saunders operation involved several players with different tasks, but Jones and Malone point to no evidence that undercuts the government's theory that these players and tasks were part of a single conspiracy, the one charged in Count 7.  See

United States v. Cabbell, 35 F.3d 1255, 1262 (8th Cir. 1994) (although "`various defendants entered the conspiracy at different times and performed different functions, the conspiracy had one criminal objective: to sell large quantities . . . [of] drugs'"); United States v. Lucht, 18 F.3d 541, 553 (8th Cir.) (separate transactions do not prove separate conspiracies), cert. denied, 115 S. Ct. 363 (1994).  There was no need for a multiple-conspiracy instruction.

E.  Sufficiency of the Evidence:  Interstate Murder-for-Hire

Saunders, Thomas, Prado, Jones, and Lynn all claim that the evidence was insufficient to support their convictions.  In this Part, we discuss only Saunders's, Lynn's, and Prado's challenges to their murder-for-hire convictions (Counts 1 and 2); we discuss the other sufficiency-of-the-evidence arguments in Part G, infra.  As the defendants are well aware, it is hard to win on an insufficiency claim:  they must show that no reasonable jury could have found them guilty beyond a reasonable doubt. We review and interpret the evidence in the light most favorable to the jury's verdict.  See United States v. Horne, 4 F.3d 579, 587, 589 (8th Cir. 1993), cert. denied, 510 U.S. 1138 (1994).

The defendants face long prison terms.  Although we will not recite all the evidence introduced at trial, we have reviewed that evidence closely and given careful consideration to the defendants' arguments.  For the reasons outlined below, we affirm the convictions of Jai Jones, Jermaine Saunders, and Larry Thomas.  We also affirm Chanise Lynn's possession-with-intent-to-distribute conviction.  We reverse Lynn's and Zackarrie Prado's murder-for-hire convictions.  Lynn and Prado may well have aided and abetted an attempted murder, and conspired to commit murder, but these are not federal crimes.

Our Constitution is a charter for a federal government of

-23-

limited powers, and under this charter the "States possess primary authority for defining and enforcing the criminal law." Engle v. Isaac, 456 U.S. 107, 128 (1982). But the Constitution gives Congress the power to regulate interstate commerce, U.S. Const., Art. I, § 8, cl. 3, and § 1958(a), which outlaws interstate murder-for-hire, is unquestionably a valid exercise of this power. Section 1958(a) provides:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value . . . [is guilty of a crime against the United States].

So, to convict the defendants under this statute, the government had to prove that they (1) travelled or caused another to travel in interstate commerce, (2) with the intent that a murder be committed, (3) for hire. United States v. McGuire, 45 F.3d 1177, 1186 (8th Cir.), cert. denied, 115 S. Ct. 2558 (1995). One can also be convicted, of course, for conspiring or aiding and abetting in connection with this offense.

This statute is relatively straightforward, both in what it prohibits and in what it does not reach. It does not prohibit murder or attempted murder. Instead, it outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed. Once the interstate-commerce facility is used with the required intent the crime is complete. One who travels or causes another to travel in interstate commerce with the necessary

murderous intent need not do anything else to violate the statute.[7]  See McGuire, 45 F.3d at 1186-87.  It is clear, moreover, that a defendant can violate § 1958(a) without actually hurting or killing anyone, because the statute provides for enhanced punishment when death or injury results from the defendant's violation of the statute.[8]  If there were any doubt, it would be dispelled by the clear legislative history:

> The gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent and the offense is complete whether or not the murder is carried out or even attempted.

S. Rep. No. 225, 98th Cong., 2d Sess. 306 (1984), reprinted in,

---

[7]Compare § 1958(a) with the Travel Act, 18 U.S.C. § 1952(a), which provides in part:

(a)  Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to--
   (1)  distribute the proceeds of any unlawful activity; or
   (2)  commit any crime of violence to further any unlawful activity; or
   (3)  otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform--

   (A)  an act described in paragraph (1) or (3) [shall be punished]; or
   (B)  an act described in paragraph (2) [shall be punished].

(emphasis added).

[8]"[Whoever violates the statute] shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title and imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both."  18 U.S.C. § 1958(a).

-25-

1984 U.S.C. Cong. & Admin. News 3182, 3485.

### 1. Jermaine Saunders

To convict Saunders of violating § 1958(a), the government had to prove that (1) Saunders caused Delpit to travel in interstate commerce, (2) he or Delpit intended that a murder be committed in violation of Minnesota law, and (3) the murder was to be committed for hire. McGuire, 45 F.3d at 1186. Saunders insists he was across town the day Delpit, Malone, and Prado were plotting the drive-by shooting, and that the government's theory of his role in the plot is based "solely and exclusively on Sgt. Murphy's interpretation of several telephone conversations." In our view, though, Sgt. Murphy's testimony provided ample evidence against Saunders. Saunders recruited Delpit to come to Minnesota and kill Vice Lords; he was the one to whom Delpit reported after his failed hit; he told Delpit to keep trying, and agreed to send Delpit's wife a partial payment of $1,500; and he organized the August 28 two-car assassination plan. It does not matter whether he was "across town" when the murder was to take place. A reasonable jury could have found that he caused Delpit to travel, with the intent that Delpit would commit murder-for-hire, and also that he conspired to violate § 1958(a).

### 2. Chanise Lynn

Ms. Lynn helped Delpit, at Saunders's request, seek out Vice Lords to kill. By this point, though, the § 1958(a) violation was complete.[9] Malone and Saunders had already caused Delpit to travel, and Delpit had already travelled, with the requisite intent that a murder-for-hire be committed. The government insists that

---

[9]The evidence suggested that Delpit had arrived in the Twin Cities by August 24, and that Chanise Lynn was recruited as Delpit's driver on August 26 and 27.

"[t]he attempted murder-for-hire and the related conspiracy continued for another week and Lynn played an integral role in it," but that does not matter.  Section 1958(a) is not a murder statute; it is a carefully-drafted federal criminal law of constitutionally limited scope.

Because the crime was complete when Delpit arrived in Minnesota, Lynn did not--she could not--aid or abet the crime's perpetrators.  If anything, she was an accessory after the fact (for which she was not charged).[10]  As Chief Judge Posner noted recently, Judge Learned Hand's "canonical" definition of aiding and abetting requires "not only that the defendant have aided his principal to commit a crime but also that he have wanted the principal to succeed in committing it.  Obviously this rules out . . . cases in which the defendant was a mere accomplice after the fact . . .." United States v. Ortega, 44 F.3d 505, 507 (7th Cir. 1995) (citing United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)); see Nye & Nissen v. United States, 336 U.S. 613, 620 (1949) ("Aiding and abetting . . . states a rule of criminal responsibility for acts which one assists another in performing.")  We regularly instruct juries that a person may be found guilty of aiding and abetting if, before or at the time the crime was committed, he knew the offense was being committed or was going to be committed; he knowingly acted to encourage, aid, or cause the offense; and he intended that the offense be committed.  See Eighth

---

[10]We made clear the distinction between accessories after-the-fact and aiders and abettors in United States v. Brown, 33 F.3d 1002 (8th Cir. 1994):  "`The very definition of the crime [accessory after the fact] also requires that the felony not be in progress when the assistance is rendered because then [the person] who renders assistance would aid in the commission of the offense and be guilty as a principal.'"  Id. at 1004 (quoting United States v. Barlow, 470 F.2d 1245, 1252-53 (D.C. Cir. 1972)); see United States v. Innie, 7 F.3d 840, 852 (9th Cir. 1993) ("Unlike one who aids or abets a crime . . . , an accessory after the fact does not agree to commit the crime . . ..."), cert. denied, 114 S. Ct. 1567 (1994).

Circuit Model Jury Instructions § 5.01 & n.4 (West 1996) (citing <u>United States v. Jarboe</u>, 513 F.2d 33, 36 (8th Cir.), <u>cert. denied</u>, 423 U.S. 849 (1975)); <u>United States v. Duranseau</u>, 26 F.3d 804, 809 (8th Cir.), <u>cert. denied</u>, 115 S. Ct. 341 (1994).  Lynn's conviction on Count 1 must be reversed because the government presented no evidence suggesting that Lynn aided and abetted Malone and Saunders in recruiting Delpit or that she aided and abetted Delpit's interstate travel.

It follows that Lynn's conviction for conspiracy to violate § 1958(a) must also be reversed.  To prove a conspiracy, the government needed to prove an agreement, between at least two people, the objective of which was to violate federal law.  See <u>United States v. Jenkins</u>, 78 F.3d 1283, 1287 (8th Cir. 1996).  Lynn joined the plot to kill Vice Lords after the object of the conspiracy charged in Count 2 was accomplished.  The government presented no evidence suggesting that Lynn conspired to cause Delpit to travel, or that she conspired with Delpit to travel, with the intent that a murder-for-hire be committed.  In the end, she may have been party to an attempted murder in Minnesota, but that is not -- nor, standing alone, could it ever be -- a federal crime.[11]

---

[11]This case is different from our recent decision in <u>United States v. Baker</u>, 82 F.3d 273, 275-76 (8th Cir. 1996).  In that case, Baker, a police officer, extorted a payment from an arrested motorist, who withdrew money from an automated teller machine (ATM) to pay the bribe.  Baker was convicted under the Travel Act, 18 U.S.C. § 1952(a), and argued on appeal that his act of extortion lacked the required effect on interstate commerce.  This Court disagreed, noting that the ATM was a "facility in interstate or foreign commerce," which Congress was entitled to regulate and to protect, even from wholly intrastate activity.  In <u>Baker</u>, the defendant argued that the United States could not prosecute him because there was no jurisdictional "hook," no "nexus" with interstate commerce.  In this case, though, the question is simply whether or not the government introduced sufficient evidence to permit a reasonable jury to conclude that the elements of a § 1958(a) violation had been proved against Lynn.

3.  Zackarrie Prado

Prado was acquitted on the drug-conspiracy count (Count 7), but, like Lynn, convicted of the interstate murder-for-hire charges (Counts 1 and 2). Prado makes the implausible argument that the government's wiretap evidence shows only that he was concerned about Vice Lords harassing his mother, not that he had anything to do with an assassination scheme. We think it quite clear that Prado, Malone, and Delpit planned to kill some Vice Lords, and that Prado knew exactly what was going on. We reverse his murder-for-hire convictions, though, for the reason discussed above:  The government did not prove that Prado committed a federal crime. As with Chanise Lynn, the government failed to prove that Prado violated § 1958(a), or that he conspired to do so, because there was no evidence that Prado had any involvement in the murder plot before the federal crime with which he was charged was complete.

F.  Sufficiency of the Evidence:  Other Convictions

Larry Thomas, Jai Jones, Chanise Lynn, and Jermaine Saunders all argue that the evidence against them was insufficient to support their drug-related convictions. We affirm the convictions.

1.  Jermaine Saunders

Saunders contends that his conviction for using or carrying a firearm during a crime of violence, 18 U.S.C. § 924(c)(1), must be reversed because, under Bailey v. United States, 116 S. Ct. 501 (1995), he is not liable for Delpit's gun use. We don't think Bailey helps Saunders. There is no question but that Delpit carried a firearm during a violent crime; in fact, he pointed it at a police officer before fleeing. Saunders was convicted of aiding and abetting Delpit, 18 U.S.C. § 2, and therefore "stepped into Delpit's shoes" for purposes of § 924(c)(1):  "[T]he acts of the principal become those of the aider and abettor as a matter of

law." <u>United States v. Simpson</u>, 979 F.2d 1282, 1284-86 (8th Cir. 1992) (emphasis omitted), <u>cert. denied</u>, 507 U.S. 943 (1993); see <u>Pereira v. United States</u>, 347 U.S. 1 (1954).  Saunders claims he didn't know Delpit was carrying a gun, but the jury, quite reasonably, found otherwise.

As for Count 8 (attempted possession with intent to distribute the 15.6 kilograms of cocaine seized in New Mexico), Saunders again insists that Sgt. Murphy's testimony and the wiretap evidence are insufficient to support his conviction.  Saunders claims the government presented no evidence connecting the New Mexico seizure to his alleged drug operation in Minnesota.  We disagree.  To convict Saunders on this Count, the government had to prove that he "intended to possess and distribute the cocaine, and that he took a substantial step toward that goal . . .." <u>United States v. Searing</u>, 984 F.2d 960, 964 (8th Cir. 1993).  The jury heard conversations between Saunders and Washington, and between Saunders and Malone, discussing the seizure of the cocaine shipment they had arranged and were expecting.  Saunders told several people that he had been hit with a loss of 15 "things" (kilograms of cocaine).  The evidence supported the jury's decision.

2.  Larry Thomas

Thomas contends that the evidence against him was insufficient to support his convictions for conspiracy to distribute cocaine base (Count 7), 21 U.S.C. § 846, and distribution of cocaine base (Count 9), 21 U.S.C. § 841(a)(1).  Regarding Count 9, Thomas says Tim Nelson's testimony that Thomas sold him drugs was the only evidence against Thomas, and, therefore, the jury's verdict was unreasonable.  Nelson told the jury that Larry Thomas was "one of the nicest persons that you would want to know," but he also testified that he bought about 1.5 kilograms of crack from Thomas over a six-month period.  Thomas thinks the jury should not have believed Nelson, and recites a 10-point litany why Nelson's

testimony is unreliable (e.g., Nelson was a paid informant, Nelson cut a deal to avoid prosecution, Nelson did not wear a body wire, etc.). But, as Thomas admits, these points came out, in one form or another, at trial, and it is the jury's business whom it chooses to believe.

Next, Thomas claims his conspiracy conviction (Count 7) must be reversed because the only evidence against him was (1) that a police officer saw him and Malone exchange a bag (an exchange Thomas insists was perfectly innocuous) and (2) coded phone conversations, none of which, Thomas contends, connect him to a drug conspiracy. Thomas says the calls were about women, sports, and a truck sale, not drugs. In the end, though, Thomas is arguing that the jury was unreasonable for believing the government's "spin" on the evidence instead of Thomas's.

As we said above, we think the evidence against Thomas shows that he was buying drugs from the Saunders/Malone operation and selling drugs to others. The question remains, was he a part of the conspiracy charged in Count 7 of this indictment? In this Circuit, a series of drug deals for resale can prove a conspiracy to distribute. See United States v. Eneff, 79 F.3d 104, 105 (8th Cir. 1996). The jury could reasonably have concluded that Thomas had an ongoing arrangement with Washington, Saunders, and Malone that they would front him with drugs for resale. The jury heard tapes in which Thomas and Saunders confirmed that the bag exchange described above was a drug-related money drop. It heard Thomas ask for more drugs from Malone and Saunders, and they heard Thomas rebuffed because he was behind on his debt. And the jury heard tapes suggesting that Washington, through Malone and Saunders, was Thomas's ultimate drug source. Thomas argues that the bag exchange was not what the government said it was, but the jury found otherwise. Thomas says that the various phone calls don't mean what Sergeant Murphy said they meant, but the jury believed Sergeant Murphy. Finally, as we discussed above, the evidence

proved that Thomas was selling drugs to others.  We affirm the conviction.

### 3.  Jai Jones

Jones was convicted of the Count 7 conspiracy and, like Thomas, contends the evidence was insufficient to support his conviction.  He says his conviction was based solely upon his transportation of procaine, "a lawful substance," and on approximately five telephone conversations with Saunders about obtaining the procaine.  In effect, Jones admits he transported the procaine, but insists that he thought what he was doing was legal.  But the jury heard evidence that Jones talked in code about the procaine; that he took precautions, on instructions from Malone, to avoid being caught with it; and that he delivered it to Malone and Saunders, who were waiting for the procaine so they could make crack.  The jury also heard evidence of Jones's experience with drug-dealing, and apparently thought he knew exactly what the procaine was for.  The evidence supports the jury's verdict.

### 4.  Chanise Lynn

Lynn also argues that the evidence does not support her conspiracy conviction.  We disagree.  The evidence suggested that Lynn was a regular courier for the Saunders/Malone operation; that she went to California, on Saunders's orders, to get procaine; and that she occasionally kept contraband and money for the conspiracy at her residence.  A reasonable jury could have found that Lynn knew of, and intentionally joined, the drug conspiracy charged in Count 7.

Chanise Lynn also contends the evidence does not support her conviction for possession with intent to distribute crack.  The government found and seized 3.7 grams of crack -- 20 individually wrapped rocks -- at her residence.  At trial, Lynn simply denied

that the drugs were hers.  She now argues that 3.7 grams is too small an amount to support the inference that she intended to distribute the crack. It is a close call, but we disagree.

Possession of such a small amount of drugs, standing alone, is an insufficient basis from which to infer intent to distribute.  United States v. Buchanan, 985 F.2d 1372, 1377 (8th Cir. 1993), cert. denied, 114 S. Ct. 2727 (1994).  See United States v. Gordon, 923 F.2d 123, 125-26 (8th Cir. 1991) (one ounce of cocaine, standing alone, would not have been enough to support inference of intent to distribute); United States v. White, 969 F.2d 681, 684 (8th Cir. 1992) (7.5 grams of cocaine was insufficient, standing alone, to support inference of intent to distribute, but as little as 5 grams could be sufficient, if accompanied by circumstantial evidence); United States v. Stephens, 23 F.3d 553, 557 (D.C. Cir.) (5.9 grams of crack was not enough to support inference of intent to distribute), cert. denied, 115 S. Ct. 552 (1994).  Of course, we don't look at the amount of drugs alone; even a small amount, if bolstered by other evidence, can show intent to distribute.  United States v. Johnson, 977 F.2d 457, 458 (8th Cir. 1992).  For example, we have held that the drugs' purity level, or the presence of cash, drug paraphernalia, firearms, and other evidence of drug-dealing, are all factors that can support an inference of intent to distribute.  See United States v. Brett, 872 F.2d 1365, 1369-70 (8th Cir.), cert. denied, 493 U.S. 932 (1989); United States v. Shurn, 849 F.2d 1090, 1093 (8th Cir. 1988).

The government introduced no evidence, from among the many wiretapped conversations or from their search of her residence, that Lynn ever dealt drugs herself.  But she was a member of a drug-dealing conspiracy, and the government's expert witness testified that the drugs found in her room were packaged for distribution.  Her defense at trial was that the drugs were not hers, but the jury obviously did not believe her.  We do not know how we would have voted if we had been on the jury, but we cannot

quite say that a reasonable juror could not have found beyond a reasonable doubt all the elements of possession with intent to distribute.

### G.   Sentencing Issues

Dennell Malone, Larry Thomas, and Jermaine Saunders challenge their sentences.  We reject most of their arguments, but remand Saunders's case for resentencing because he did not organize or lead five "participants" in the murder-for-hire plot.

#### 1.   Crack/Cocaine Powder Disparity

Under the Sentencing Guidelines, a gram of crack cocaine is "worth," for sentencing purposes, 100 times as much as a gram of cocaine powder.  U.S.S.G. Guideline Manual § 2D1.1.  This is a harsh rule.  Malone argues that the 100-to-1 ratio is "obsolete," and Thomas insists it is unconstitutional because of its disparate impact on black defendants.  We are bound by precedent to reject these arguments.  See United States v. Jackson, 67 F.3d 1359, 1367-68 (8th Cir. 1995), cert. denied, 116 S. Ct. 1684 (1996).

#### 2.   Evidentiary Hearing

Malone complains that he was sentenced without an evidentiary hearing.  He failed, though, to move for an evidentiary hearing as required by the District Court's Local Rule 83.10(f) ("The interested party must file a separate Motion for Evidentiary Hearing contemporaneous with submission of the [sentencing] position pleading.")  True, in his "Position Paper for Sentencing," Malone disputed his liability for the 15.6 kilograms of cocaine seized in Utah, and added that "this denial/challenge precipitates an evidentiary hearing."  The government responded to Malone's position paper by noting that he had not filed the required motion for evidentiary hearing.  Although thus warned, Malone never filed

such a motion, nor did he say anything about the need for an evidentiary hearing at his sentencing. See United States v. Oehlenschlager, 76 F.3d 227, 230-31 (8th Cir. 1996) ("[W]e will not permit the defendant to sandbag the district court by contesting valuation without submitting a request for an evidentiary hearing, as required by local rule.")

In his position paper, Malone claims he should not have been sentenced for the 15.6 kilograms of cocaine seized in Utah. He also argues that he is not liable for all the drugs involved in Counts 10 and 11 (drug-dealing using juveniles) or Count 7. Malone is correct that a PSR is "not a legally sufficient basis for making findings on contested issues of material fact," because the government must prove, by a preponderance of the evidence, all facts relied on by the sentencing court. United States v. Hammer, 3 F.3d 266, 272 (8th Cir. 1993), cert. denied, 510 U.S. 1139 (1994). When a defendant disputes material facts in his PSR, the sentencing court must either refuse to take those facts into account or hold an evidentiary hearing. Oehlenschlager, 76 F.3d at 229. This rule reflects the courts' concern that disputed statements in a PSR might lack the indicia of reliability and trustworthiness required by the preponderance-of-the-evidence standard. See Hammer, 3 F.3d at 271-72.

This concern does not apply here. At Malone's sentencing, the District Court made it clear that it was relying on evidence and testimony from the trial, and on the jury's verdict.[12] Unlike the PSR, the testimony presented at trial is evidence. See United States v. Greene, 41 F.3d 383, 386 (8th Cir. 1994) ("If the sentencing court chooses to make a finding with respect to the disputed facts, it must do so on the basis of evidence, and not the

---

[12]After considering the objections in Malone's position paper, the Court "adopt[ed] the findings of the jury." Malone Sentencing Hearing, at p. 8 (June 12, 1995).

presence report."). The jury found Malone guilty, beyond a reasonable doubt, of the conduct on which Malone's sentence is based, and the Court heard testimony at trial concerning the drug quantities involved with that conduct. Even if we were inclined to overlook Malone's failure to comply with the local rule, an evidentiary hearing was not required in this case. See United States v. Simpkins, 953 F.2d 443, 445 (8th Cir.) (district court permitted to rely on evidence received at trial when making findings, for sentencing purposes, regarding amount of cocaine involved and defendant's role in the offense), cert. denied, 504 U.S. 928 (1992).

3. "Role in the Offense" Enhancement

In accordance with U.S.S.G. § 3D1.2-.3, the District Court grouped the charges against Malone and Saunders into three groups of "closely-related counts," and calculated the adjusted offense levels appropriate for each group. Group 1 included the murder-for-hire counts; Group 2 included the drug-trafficking counts; and Group 3 consisted of the cellular-phone fraud counts. Malone and Saunders object to their four-level "leadership role" enhancements for Groups 1 and 2. U.S.S.G. § 3B1.1(a) provides for such an increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants . . .." Our Court has "broadly defined" the terms "organizer" and "leader." United States v. Ortiz-Martinez, 1 F.3d 662, 677 (8th Cir.), cert. denied, 510 U.S. 936 (1993).

Regarding Malone's role in the drug-trafficking offense group, the evidence showed that he "directed or procured the aid of underlings," and that he was responsible for organizing others for the purpose of carrying out crimes. See United States v. Rowley, 975 F.2d 1357, 1364 & n.7 (8th Cir. 1992) (citations omitted). For instance, the jury found (by convicting Malone on Counts 11 and 12) that Malone organized and coordinated several juveniles' drug

dealing.

Saunders complains that the District Court gave him a four-level role enhancement for the drug-dealing offenses but "offered neither at sentencing nor in the written Statement any additional findings of fact to support this conclusion." The District Court found that Saunders was convicted for his role in a drug conspiracy involving at least five others, and that he played an organizing and leadership role.[13] For example, Saunders sent Chanise Lynn to Los Angeles to procure procaine for the manufacture of crack cocaine. While we do not pretend that the line between being an "organizer or leader," on the one hand, and a "manager or supervisor," on the other, is always clear, see Ortiz-Martinez, 1 F.3d at 677; United States v. Mustread, 42 F.3d 1097, 1104 (7th Cir. 1994) ("Reviewing [a role enhancement] is often a murky inquiry."), we think the § 3B1.1(a) enhancements for Offense Group 2 were appropriate.

Saunders and Malone also received four-level role-in-the-offense enhancements for Offense Group 1 (murder-for-hire). At Saunders's sentencing hearing, the District Court commented, "[i]t appears that [Saunders] was an organizer or leader of this criminal activity which involved five or more participants, . . . [including] Malone, Delpit, Prado, and Lynn." The Court also found that the enhancement was proper in Malone's case, "based upon the evidence that [was] submitted in this matter . . . .." However, because the District Court counted Prado and Lynn as "participants" for purposes of Offense Group 1, we think it erred in imposing four-level enhancements for that offense group.

It is true that a person need not have been convicted to count

_____

[13]At Saunders's sentencing, the Court noted that "[t]he trial testimony in this matter clearly shows the leadership role of the defendant as it applied to these proceedings." Saunders Sentencing Hearing, at p. 17 (June 12, 1995).

as a "participant" under § 3B1.1; a "participant" is "a person who is criminally responsible for the commission of the offense . . .." Id. at cmt. 1; see United States v. Freeman, 30 F.3d 1040, 1042 (8th Cir. 1994) (persons who were not indicted or tried, but who were nonetheless criminally responsible for defendant's crime, were "participants" under § 3B1.1). As we discussed above, though, Prado and Lynn were not criminally responsible for Saunders's and Malone's § 1958(a) violations; their federal crimes were complete before Prado and Lynn were recruited to assist Delpit. See United States v. Lewis, 68 F.3d 987, 989-90 (6th Cir. 1995) (because persons lacked knowledge and intent required by underlying offense, they could not be "participants" under § 3B1.1); United States v. Melendez, 41 F.3d 797, 800 (2d Cir. 1994) (persons who received proceeds from theft not "participants" under § 3B1.1).

In Malone's case, though, even if he had received no enhancement at all for his role in the Group 1 offenses, he would still be facing a mandatory life sentence.[14]  It is not necessary, therefore, to remand Malone's case for resentencing.  Saunders's case is different.  Had he received no role enhancement for the murder-related group of offenses, he would have been eligible for a 30-year sentence.[15]  This is not to say that, at resentencing,

---

[14]Malone's Group 1 adjusted offense level was 36; his Group 2 adjusted offense level was 43, and his Group 3 level was 8.  The District Court correctly selected the greater of these three levels (43), and increased it by one level under § 3D1.4 to arrive at a total offense level of 44.  Had Malone received no enhancement for his role in the Group 1 offenses, his Group 1 adjusted offense level would have been 32, and his total offense level would have been 43, not 44.  See § 3D1.4(b).  An offense level of 43 calls for a mandatory life sentence.

[15]Saunders's adjusted offense level for Group 1 (with the four-level role enhancement) was 36; his adjusted offense level for Group 2 was 42; and for Group 3, 10.  The highest adjusted offense level was 42, and the District Court increased it by one under § 3D1.4 for a total offense level of 43.  Had Saunders not received any role enhancement for Group 1, his total offense level would have been 42, § 3D1.4(c), which would have permitted the District Court to impose a 30-year sentence.

Saunders won't again receive a four-level enhancement.  Section 3B1.1(a) permits a four-level enhancement when a defendant is the leader or organizer of a criminal activity that is "otherwise extensive," and it may be that such an enhancement is appropriate in Saunders's case.  That is a question for the District Court to decide.

### 4.    Saunders's Relevant Conduct

The District Court held Saunders responsible for 532.3 grams of crack involved in Counts 10 and 11 (the Counts involving Malone's use of juveniles in drug-dealing).  The Court found that these drugs were part of the Saunders/Malone operation -- part of the overall conspiracy -- and were therefore attributable to Saunders.  Saunders contends that the evidence does not support this finding.  He admits, though, that he may be sentenced for drug quantities which are part of the conspiracy, and are reasonably foreseeable.  See U.S.S.G. § 1B1.3(a)(1)(B) (A defendant may be sentenced for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction . . ..").  It is not necessary that Saunders have participated in distributing the drugs himself, or even that he actually knew about the drugs, only that the drug quantities were reasonably foreseeable to him.  See Darden, 70 F.3d at 1546.  We think the District Court correctly found that the 532.3 grams of crack were part of the operation's "overall activity" and were "part of the conspiracy count [on] which [Saunders] was convicted."[16]

---

[16]Saunders Sentencing Hearing, at p. 18 (June 12, 1995).

III.

We affirm the convictions and sentences of Jai Jones, Larry Thomas, Calvin Delpit, and Dennell Malone; reverse Jermaine Saunders's four-level role-in-the-offense enhancement on the murder-for-hire charge; affirm in part and reverse in part Chanise Lynn's convictions; and reverse Zackarrie Prado's interstate murder-for-hire conviction. We remand this case to the District Court for further proceedings consistent with this opinion. Saunders and Lynn should be re-sentenced, and the indictment against Prado should be dismissed.

A true copy.

   Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.